IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEVIN CLOYD, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-20-3714 |
| KBR, INC., | § § § § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Three employees of a contractor working on an American military base in Iraq have sued the contractor's parent company, alleging that it is responsible for the injuries they received when Iranian ballistic missiles struck the base in January 2020. The threshold issues are whether the claims belong in federal court and whether there are viable claims at all. The plaintiffs ask the court to remand to state court; the defendant asks the court to dismiss the claims.

Based on the pleadings, the record, and the applicable law, the court finds no basis to remand, and denies the motion to dismiss. The denial of the motion to dismiss is without prejudice to the defendant's ability to reurge the arguments, if appropriate, in a motion for summary judgment, after discovery targeted and limited to the Defense Base Act and combatant-activity defenses. Discovery on these defenses will end August 27, 2021. The defendant may file a motion for summary judgment no later than September 17, 2021. The court will hear oral argument on the motion on October 27, 2021, by Zoom.

The reasons for these rulings are set out below.

**I.     Background**

The complaint alleges that in January 2020, Iran launched ballistic missiles at the United States Army forward operating base in Al Asad, Iraq. (Docket Entry No. 1-1 at ¶¶ 5.1, 5.36). The attack was allegedly in retaliation for the killing of General Qassem Soleimani. (*Id.* at ¶ 5.2). Kevin Cloyd, Nickalandra Witherspoon, and Lucille Andrade were employed by Service Employees International and working at the Al Asad base when the attack occurred. (*Id.* at ¶¶ 5.38, 5.39). They sustained significant injuries. (*Id.* at ¶¶ 5.37, 5.38).

Service Employees International performed services for the U.S. Army under the Logistics Civil Augmentation Program (LOGCAP) IV contract. (Docket Entry No. 1-5 at ¶¶ 4–9). KBR owns Service Employees International. (Docket Entry No. 3-1 at 1 n.1). The plaintiffs allege that KBR was not a party to the LOGCAP IV contract. (Docket Entry No. 1-1 at ¶ 4.3). KBR submitted a declaration by Michael Flanagan, the Vice President of Government Solutions at KBR, stating that the U.S. Army had "awarded" the LOGCAP IV contract to KBR. (Docket Entry No. 1-5 at ¶ 4). The plaintiffs allege that KBR supervised the Service Employees International employees working under the LOGCAP IV contract. (Docket Entry No. 1-1 at ¶ 5.39).

The plaintiffs sued KBR in Texas state court for negligence and gross negligence, alleging that KBR was "aware of the heightened risk of a strike in the face of escalating regional violence," but "left [the] Plaintiffs and the other employees of Service Employees International . . . at the base, in direct risk of substantial harm." (*Id.*). The plaintiffs allege that KBR negligently failed to "evacuate contractors" or "provide security measures," such as "communication of safety information and status updates, a means of evacuating Iraq when conditions became unreasonably dangerous, and protection from violent attacks." (*Id.* at ¶ 6.3).

KBR removed to federal court under the federal-officer removal statute, the plaintiffs moved to remand, and KBR moved to dismiss. (Docket Entry Nos. 1, 3). Because the record supports federal jurisdiction, remand is denied. KBR argues that either the Defense Base Act or the combatant-activities exception to the Federal Tort Claims Act preempt the plaintiffs' claims. Because, on the current record, the court cannot reliably determine whether either defense is preemptive as KBR argues, the motion to dismiss is also denied.

## II.     The Applicable Legal Standards

### A.     The Motion to Remand

"A party may remove an action from state court to federal court if the action is one over which the federal court possesses subject matter jurisdiction." *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (citing 28 U.S.C. § 1441(a)). "The removing party bears the burden of showing that federal jurisdiction exists and that removal was proper." *Id.* (quotation and citations omitted). "To determine whether jurisdiction is present for removal," the court considers "the claims in the state court petition as they existed at the time of removal." *Id.* (citation omitted). The Fifth Circuit construes the statute in favor of remand and construes ambiguities against the removing party. *Id.*

The Federal Officer Removal Statute states:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States . . . :
>
> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

28 U.S.C. § 1442(a)(1).

"Federal officers may remove cases to federal court that ordinary federal question removal would not reach." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290–91 (5th Cir. 2020).

3

Section 1442(a) permits "any officer . . . of the United States or . . . person acting under [him or her]," 28 U.S.C. § 1442(a)(1), to remove an action, even if the plaintiff's complaint raises no federal question, so long as the officer asserts a "colorable federal defense," *Latiolais*, 951 F.3d at 291. As the Supreme Court has explained, "the raising of a federal question in the officer's removal petition . . . constitutes the federal law under which the action against the federal officer arises for Art. III purposes." *Mesa v. California*, 489 U.S. 121, 136 (1989). The Court has consistently urged courts to avoid "a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981); *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

### B. The Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Lincoln v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

### III. Analysis

#### A. Remand

To remove under § 1442(a), KBR must show that "(1) it is a 'person' within the meaning of the statute, (2) it acted 'pursuant to a federal officer's directions,' . . . (3) it asserts a 'colorable federal defense,'" and (4) there is "'a causal nexus' between the defendant's acts under color of federal office and the plaintiff's claims." *Latiolais*, 951 F.3d at 292 (citation omitted).

KBR satisfies the first prong. *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) ("We have previously held that corporate entities qualify as 'persons' under § 1442(a)(1).").

KBR also meets the second prong, which is liberally construed. *See Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("We liberally construe this term."). A defendant acts under a federal officer's directions when it acts under a contract with the federal government to perform "a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 154 (2007); *see also Latiolais*, 951 F.3d at 291 ("[The contractor's] status as a 'person' and its federal contract with the Navy . . . satisfy the first and second conditions."); *Ruppel*, 701 F.3d at 1181 ("'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."). The plaintiffs allege that they worked at the Al Asad base under the LOGCAP IV contract between the U.S. Army and Service Employees International. KBR is a signatory to the LOGCAP IV contract, (Docket Entry No. 1-5 at ¶ 4), and owns Service Employees International. *See La. United Bus. Ass'n Cas. Ins. Co. v. J & J Maint., Inc.*, 133 F. Supp. 3d 852, 858 (W.D. La. 2015) ("We observe that sufficient federal direction has also been found under § 1442(a) when a private contractor performed maintenance on generators at an Army encampment, based on the fact that this work was done under Army supervision and that the contractor could not expand the scope of its work without authorization." (citing *McGee v. Arkel Int'l, LLC*, 716 F.Supp.2d 572, 577 (S.D. Tex. 2009)).

The third prong is also met. A federal defense is colorable "unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Latiolais*, 951 F.3d at 296 (quoting *Zeringue v. Crane Co.*, 846 F.3d 785, 793–94 (5th Cir. 2017)).

As discussed below, KBR asserts colorable federal defenses under the Defense Base Act and the combatant-activities exception to the Federal Tort Claims Act. Although the present record is insufficient for the court to determine whether either or both defenses apply, KBR has asserted a colorable basis to infer that one or both may preempt the plaintiffs' claims.

Finally, KBR meets the fourth prong, showing that the plaintiffs' claims are "alternatively connected or associated" with "acts under color of federal office." *Latiolais*, 951 F.3d at 292. The limited record shows that the military had control over the safety and defense protocols at the Al Asad base. (Docket Entry No. 1-5 at ¶¶ 6–13). While KBR did not directly employ the plaintiffs, it was a party to the LOGCAP IV contract. (*Id.* at ¶ 4). The record also shows that KBR's ability to control any civilian personnel, including the plaintiffs, was subject to the U.S. military's control over the Al Asad base, a forward operating base in Iraq. (*Id.* at ¶¶ 7, 11). The plaintiffs' claims arise from the work they performed under their employer's contract with the military and involve actions that took place on a military base. The plaintiffs' claims are associated with acts taken under color of federal office. *See Latiolais*, 951 F.3d at 296 ("[The government contractor] performed the refurbishment and, allegedly, the installation of asbestos pursuant to directions of the U.S. Navy."); *McGee*, 716 F. Supp. 2d at 577 ("[T]he actions at issue were taken under the direct and detailed control of federal officers because [the contractor's] maintenance and power generation services at [a military base] were performed [under a contract] with the U.S. Army.").

The court has jurisdiction under 28 U.S.C. § 1442.

**B.     The Defense Base Act**

The Defense Base Act extends workers' compensation coverage under the Longshore and Harbor Workers' Compensation Act to "employees of American contractors engaged in construction related to military bases in foreign countries, and to foreign projects related to the

national defense whether or not the project is located on a military base." *AFIA/CIGNA Worldwide v. Felkner*, 930 F.2d 1111, 1112 (5th Cir. 1991). The Act "establishes a uniform, federal compensation scheme for civilian contractors and their employees for injuries sustained" while working abroad under a contract with the United States. *Fisher v. Halliburton*, 667 F.3d 602, 610 (5th Cir. 2012); *see also* 42 U.S.C. § 1651(a)(4).

The Defense Base Act is designed to "save the previous heavy expense of providing its contractors with insurance of such employees on the basis of tort liability and full accident insurance." *O'Keeffe v. Pan Am. World Airways, Inc.*, 338 F.2d 319, 322 (5th Cir. 1964). Under the Act, "[e]mployers relinquish[] their defenses to tort actions in exchange for limited and predictable liability," and "[e]mployees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail." *Fisher*, 667 F.3d at 610 (quoting *Morrison-Knudsen Constr. Co. v. Dir. Off. Workers' Comp. Programs*, 461 U.S. 624, 636 (1983)); *see Davila-Perez v. Lockheed Martin Corp.*, 202 F.3d 464, 468 (1st Cir. 2000) ("The purpose of the Defense Base Act is to provide uniformity and certainty in availability of compensation for injured employees on military bases outside the United States.").

The Defense Base Act "includes a provision making an employer's liability under the workers' compensation scheme exclusive." *Fisher*, 667 F.3d at 610 (citing 42 U.S.C. § 1651(c)); *see also Flying Tiger Lines, Inc. v. Landy*, 370 F.2d 46, 52 (9th Cir. 1966) ("[T]he coverage provisions of the Defense Base Act clearly evidence the intent that the act shall afford the sole remedy for injuries or death suffered by employees in the course of employments which fall within its scope."). If an employee's injury is covered by the Act, the employee generally cannot pursue a tort claim against his employer for the same injury. *See Fisher*, 667 F.3d at 610; *see also Garcia v. Amfels, Inc.*, 254 F.3d 585, 588 (5th Cir. 2001) ("The LHWCA is a preemption defense.");

8

*Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 683 (D. Md. 2012) ("[The plaintiffs' claim for intentional infliction of emotional distress] will be dismissed . . . because it can only be viewed as a negligence claim for which the exclusive remedy for the Plaintiffs is under the [Defense Base Act].").

### 1. Injury Under the Defense Base Act

The Act defines "injury," as follows:

> The term "injury" means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment.

33 U.S.C. § 902(2). The Fifth Circuit has held that this definition has four elements: "[t]here must be (1) be a willful act; (2) by a third person; (3) directed against the employee because of his employment; (4) that causes the employee's injury." *Fisher*, 667 F.3d at 610.

The plaintiffs allege that they were working for a military contractor at an overseas military base and were injured when a foreign country attacked the base with missiles. (Docket Entry No. 1-1 at ¶¶ 5.2, 5.39). In *Fisher*, the Fifth Circuit addressed similar claims. The *Fisher* plaintiffs were military-contractor employees providing logistics and support services in Iraq when insurgents attacked their convoys, injuring them. *Fisher*, 667 F.3d at 610. The plaintiffs were working under a predecessor to the LOGCAP IV contract at issue here. *Id.* at 610. The Fifth Circuit held that the plaintiffs' claims were barred under the Defense Base Act. *Id.* at 620. The insurgents attacked the plaintiffs willfully; the insurgents were third persons; the attacks were directed against the plaintiffs because of their employment as government contractors "driving trucks in support of the American coalition's rebuilding and security efforts in Iraq"; and the attack was the "direct cause" of the plaintiffs' injuries. *Id.* at 616, 617 ("We think it self-evident that driving trucks in Iraq in support of United States military operations augmented the probability that Plaintiffs would fall victim to an attack by insurgent forces, and that the character of Plaintiffs'

9

employment—providing support services to an occupying military force—increased the likelihood that Plaintiffs would be targeted by forces opposed to the United States' presence in Iraq in 2004.").

The same reasoning applies here. The complaint alleges that Iran attacked the Al Asad base in "retaliation . . . [for] the death of General Qassem Soleimani." (Docket Entry No. 1-1 at ¶ 5.2). The allegations are that there was missile attack that was willful, carried out by third parties, the direct cause of the plaintiffs' injuries, and related to the U.S. military's operations in Iraq. (*Id.* at ¶¶ 5.29, 5.34). The plaintiffs do not allege that Iran attacked them out of "personal animosity" or for "purely personal reasons." *Fisher*, 667 F.3d at 613.

### 2. The Employer Under the Defense Base Act

In this case, the plaintiffs are suing the parent company of their employer; in *Fisher*, the plaintiffs sued their employer and other affiliated entities. The plaintiffs argue that this is enough to distinguish *Fisher*. The plaintiffs' position is that the Defense Base Act does not apply because they did not have a direct employment relationship with KBR. Instead, KBR is the parent company of Service Employees International, the plaintiffs' employer.

The Act does not define "employer." *Fisher v. Halliburton*, 703 F. Supp. 2d 639, 663 (S.D. Tex. 2010), *rev'd on other grounds*, 667 F.3d 602 (5th Cir. 2012). To define "employer" under the Act, courts have turned to the Longshore and Harbor Workers' Compensation Act's definition: "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States." 33 U.S.C. § 902(4); *see also Fisher*, 703 F. Supp. 2d at 663. An employer under the Defense Base Act is "someone whose employees are covered by the [Act]." *Fisher*, 703 F. Supp. 2d at 663; *cf. Schmit v. ITT F. Elec. Int'l*, 986 F.2d 1103, 1104 (7th Cir.1993) ("The Defense Base Act generally entitles employees at overseas military bases to benefits of the Longshore and Harbor Workers' Compensation Act[.]").

The Fifth Circuit has held that, under the Longshore and Harbor Workers' Compensation Act, an employee can have multiple "employers," each of which is entitled to immunity. *See Heavin v. Mobil Oil Expl. & Prod. Se., Inc.*, 913 F.2d 178 (5th Cir. 1990); *Oilfield Safety & Machine Specs., Inc. v. Harman Unlimited, Inc.*, 625 F.2d 1248, 1256 (5th Cir. 1980). To determine if an employee has multiple employers, the Fifth Circuit applies the "relative nature of the work test":

> In determining the existence of an employee-employer relationship pursuant to this test, one examines the nature of the claimant's work in relation to the regular business of the employer. This examination must focus on two distinct areas: the nature of the claimant's work and the relation of that work to the alleged employer's regular business. In evaluating the character of a claimant's work, a court should focus on various factors, including the skill required to do the work, the degree to which the work constitutes a separate calling or enterprise, and the extent to which the work might be expected to carry its own accident burden. In analyzing the relationship of the claimant's work to the employer's business the factors to be examined include, among others, whether the claimant's work is a regular part of the employer's regular work, whether the claimant's work is continuous or intermittent, and whether the duration of claimant's work is sufficient to amount to the hiring of continuing services as distinguished from the contracting for the completion of a particular job.

*Oilfield Safety*, 625 F.2d at 1253; *see also Fisher*, 703 F. Supp. 2d at 664.

This lengthy test is highly fact dependent. The only court to apply this test in a Defense Base Act case did so on a summary judgment motion.[1] *Fisher*, 703 F. Supp. 2d at 664. KBR highlighted other decisions suggesting that parent companies qualify as employers under the Act, but these were decisions on summary judgment motions, not motions to dismiss. *See Ross v. DynCorp*, 362 F. Supp. 2d 344, 347 (D.D.C. 2005); *Carr v. Lockheed Martin Tech. Servs., Inc.*, No. 97-CV-1408, 1999 WL 33290613, at *1 (W.D. Tex. Feb. 8, 1999).

Here, the court has few, if any, facts about the relationship between the plaintiffs and KBR. The plaintiffs do not describe the type of work they performed at the Al Asad base. They allege

---

[1] While the district court's decision was reversed, the multiple-employer issue was not appealed.

that they were employed by Service Employees International, and that KBR supervises Service Employees International. (Docket Entry No. 1-1 at ¶ 5.39). KBR did not clarify the relationship among KBR, Service Employees International, and the LOGCAP IV contract. Without more, the court cannot conclude, as a matter of law, that KBR does, or does not, qualify as the plaintiffs' employer under the Defense Base Act.

The Defense Base Act is "liberally construed," *Voris v. Eikel*, 346 U.S. 328, 333 (1953); the plaintiffs filed a claim under the Act against KBR, alleging that KBR is its employer, (Docket Entry Nos. 3-1 at 1, 25-1, 25-2); KBR has an insurance policy, as required under the Act, (Docket Entry No. 25-3); and the plaintiffs have alleged that KBR had control over them, (Docket Entry No. 1-1 at ¶ 5.39). The court will allow limited discovery on KBR's Defense Base Act defense. *See Martin v. Halliburton*, 618 F.3d 476, 488 (5th Cir. 2010) ("Because the basis for many of these defenses is a respect for the interests of the Government in military matters, district courts should take care to develop and resolve such defenses at an early stage while avoiding, to the extent possible, any interference with military prerogatives. Thorough consideration should be given to limiting discovery initially to such defenses.").

    **C.**    **The Combatant-Activities Exception**

The Federal Tort Claims Act waives sovereign immunity for certain tort claims against the federal government, but it contains several exceptions to that waiver. One exception is for "[a]ny claim arising out of combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The combatant-activities exception "preempt[s] state or foreign regulation of federal wartime conduct." *Saleh v. Titan Corp.*, 580 F.3d 1, 7 (D.C. Cir. 2009). While Federal Tort Claims Act exceptions do not expressly apply to private actors, 28 U.S.C. § 2671, several courts have applied the combatant-activities exception to government contractors.

*See In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 348 (4th Cir. 2014); *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 479 (3d Cir. 2013); *Aiello v. Kellogg, Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698, 709 (S.D.N.Y. 2011) (citation omitted); *Saleh*, 580 F.3d at 6.

Courts apply a three-step test, derived from *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507 (1988), to determine whether a Federal Tort Claims Act exception preempts state law. First, courts identify the "uniquely federal interests" behind the exception. *Id.* at 504–07. Second, courts determine whether refusing to apply the exception to government contractors would produce a "significant conflict" between unique federal interests and state law. *Id.* at 507–12. Third, courts determine whether the "private service contractor [was] integrated into combatant activities over which the military retains command authority." *Saleh*, 580 F.3d at 9; *see also Burn Pit Litig.*, 744 F.3d at 347 (applying the *Saleh* test); *Harris*, 724 F.3d at 479 (same). Each step is examined below.

### 1. Unique Federal Interests

Courts have had little trouble concluding that the federal government has a unique federal interest in "the management of wars." *Harris*, 724 F.3d at 479; *see also Burn Pit Litig.*, 744 F.3d at 348; *Aiello*, 751 F. Supp. 2d at 710; *Saleh*, 580 F.3d at 7.

### 2. Significant Conflict Between State Tort Law and Federal Interests

Courts also agree that, "when state tort law touches the military's battlefield conduct and decisions, it inevitably conflicts with the combatant activity exception's goal of eliminating such regulation of the military during wartime." *Burn Pit Litig.*, 744 F.3d at 349. Courts have disagreed, however, about when state tort law has the potential to conflict with military decisions during wartime. Courts have offered three main views.

13

The Third and Fourth Circuits agree that the purpose of the combatant-activities exception is to "foreclose state regulation of the military's battlefield conduct and decisions." *Harris*, 724 F.3d at 479; *see also Burn Pit Litig.*, 744 F.3d at 348 ("We find the Third Circuit's analysis persuasive and adopt its formulation of the interest at play here."). State tort law interferes with this purpose when the military exercised some level of control over the contractor's allegedly tortious actions, but not when "the federal government has little or no control over a contractor's conduct." *Burn Pit Litig.*, 744 F.3d at 348.

This view aligns with the exception's text, which states that the exception applies to "[a]ny claim *arising out of* combatant activities." 28 U.S.C. § 2680(j) (emphasis added). In workmen's compensation statutes, the phrase "arising out of" "denote[s] any causal relationship." *Aiello*, 751 F. Supp. 2d at 709 (citing *O'Leary v. Brown-Pacific-Maxon, Inc.*, 340 U.S. 504, 507 (1951)). The term "suggests that [the combatant-activities] immunity is quite broad." *Harris*, 724 F.3d at 480; *see also Burn Pit Litig.*, 744 F.3d at 348; *Aiello*, 751 F. Supp. 2d at 710. Reading the exception to cover actions against military contractors arising out of events involving U.S. military decisions and actions prevents "second-guessing [of] military judgment." *Aiello*, 751 F. Supp. 2d at 710.

The Ninth Circuit and D.C. Circuit follow two different paths. The Ninth Circuit suggests that state tort law conflicts with the military regulation of wartime only when claims are brought by "those against whom force is directed as a result of authorized military action." *Koohi*, 976 F.2d at 1337. Other courts have rejected this test as excessively narrow because it limits the combatant-activities exception to "claims stemming directly from the use of force," excluding indirect wartime harms. *Burn Pit Litig.*, 744 F.3d at 348. For example, the Ninth Circuit's view would exclude claims stemming from "friendly fire," *Harris*, 724 F.3d at 480, and claims by "bystanders and allies, even in actual live-fire combat events," *Aiello*, 751 F. Supp. 2d at 710.

Harm in these scenarios might be the product of U.S. military decisions. The Ninth Circuit also seemed to walk back its statement by suggesting that the combatant-activities exception would apply to plaintiffs who were not harmed by the direct use of force, such as "those who supply ammunition to fighting vessels in a combat area" and "those who supply a vessel's weapons." *Koohi*, 976 F.2d at 1336–37.

The D.C. Circuit suggested that the combatant-activities exception eliminates "tort from the battlefield." *Saleh*, 580 F.3d at 7. Other courts have found this too broad. The combatant-activities exception is part of the Federal Tort Claims Act, which does not "provide immunity to nongovernmental actors." *Harris*, 724 F.3d at 480. This suggests that Congress intended to give government contractors less than the full immunity enjoyed by the government. The purpose behind the combatant-activities exception—preventing courts from second-guessing military decisions—does not require preempting torts that stem from purely private actions. Total preemption might, for example, preclude claims based on "contractors' contractual violations," even though "the conduct underlying these violations is . . . [independent] of the military's battlefield conduct and decisions." *Id.* at 481 ("After all, if the contractors' conduct did follow from the military's decisions or orders, then the conduct would presumably not be in violation of the contract."). The D.C. Circuit recognized this by limiting preemption to contractor actions over which "the military retains command authority." *Saleh*, 580 F.3d at 9 ("[A] supply contractor that had a contract to provide a product without relevant specifications would not be entitled to the preemption defense if its sole discretion, rather than the government's, were challenged.").

In sum, the combatant-activities exception is designed to prevent courts in state tort cases from second-guessing military decisions, after the fact. State tort law significantly conflicts with this unique federal interest when the military has at least some control over the military

15

contractor's allegedly tortious actions. This favors rejecting the Ninth and D.C. Circuit approaches and instead following, as the more persuasive, the Third and Fourth Circuit reasoning.

### 3. The Command-Authority Test

To determine whether the combatant-activities exception preempts a state tort claim, courts apply the "command-authority" test. This test states that "[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." *Id.* The Third, Fourth, and D.C. Circuits have adopted this test, breaking it into two prongs: (1) "whether the contractor is integrated into the military's combatant activities" and (2) "whether the contractor's actions were the result of the military's retention of command authority." *Harris*, 724 F.3d at 481.

#### a. Combatant Activities

Courts use an expansive definition of "combatant activity" that includes "not only physical violence, but activities both necessary to and in direct connection with actual hostilities." *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948); *Burn Pit Litig.*, 744 F.3d at 351 ("We agree with the *Johnson* court's reasoning and adopt its test here."). Courts have held that contractors were engaging in combatant activities when they managed latrines "for active military combatants on a forward operating base," *Aiello*, 751 F. Supp. 2d at 702, 712–13; maintained "electrical systems at a barracks in an active war," *Harris*, 724 F.3d at 481; performed waste-management and water treatment functions to aid military personnel in a combat area, *Burn Pit Litig.*, 744 F.3d at 351; and supplied weapons to vessels fighting in a combat area, *Koohi*, 976 F.2d at 1336–37.

The present record does not make clear what work the plaintiffs did or what services they provided at the Al Asad base. KBR's Vice President of Government Solutions submitted a

declaration stating that KBR typically performs "operations and maintenance, laundry, water and ice production and delivery, firefighting, fuel delivery, and waste management" in Iraq. (Docket Entry No. 1-5 at ¶ 6). The declaration, however, does not make clear whether the plaintiffs and Service Employees International performed the same functions as KBR. The plaintiffs allege that they were employed by Service Employees International and worked at the Al Asad base, but without further information. (Docket Entry 1-1 at ¶ 5.39). Without more information in the record, the court cannot reliably or accurately determine whether the plaintiffs were engaged in combatant activities.

### b. Command Authority

Courts determine whether the U.S. military has command authority over a contractor by examining the contractor's discretion in performing its duties. If the contractor has significant discretion in the way it performs its duties, the military does not retain command authority. *Harris*, 724 F.3d at 482 ("The considerable discretion [the contractor] had in deciding how to complete the maintenance at issue here thus prevents the plaintiffs' suit from being preempted because the military did not retain command authority over [the contractor's] actions."); *Aiello*, 751 F. Supp. 2d at 714 ("Any renovation activities required approval from the [the military] before they could be performed."). Courts look to contract terms, *Aiello*, 751 F. Supp. 2d at 714, and "the extent to which [the contractor] was integrated into the military chain of command," *Burn Pit Litig.*, 744 F.3d at 351.

KBR did not produce a copy of the LOGCAP IV contract, and no discovery has taken place. *See Burn Pit Litig.*, 744 F.3d at 351 ("The district court therefore erred in resolving this issue before discovery took place."). Without the contract or other information in the record, the court cannot reliably or accurately determine what kind of work Service Employees International

performed at the Al Asad base, much less the level of discretion KBR had over that work. One plaintiff, Witherspoon, submitted a Defense Base Act Claim for Compensation stating that she was a "Senior Security Officer." (Docket Entry No. 25-1). Another plaintiff, Andrade, submitted a Claim stating that she was a "Food Service Worker." (Docket Entry No. 25-2). The record reveals little other information about the work the plaintiffs performed at the Al Asad base, or about what level of discretion Service Employees International had over that work.

The record is similarly lacking in information needed for the court to examine and determine what KBR did to manage the work Service Employees International's employees, including the plaintiffs, did at the base. It is also unclear how much discretion KBR and Service Employees International had as to whether, when, and how to evacuate contractors working under the LOGCAP IV contract. Flanagan's declaration, submitted by KBR, states that the Army was responsible for establishing the "defense procedures and force protection postures" that applied to military and civilian personnel at the Al Asad base. (Docket Entry No. 1-5 at ¶ 12). But it is unclear what these defense procedures and force-protection postures were and how they applied to the plaintiffs, to Service Employees International, or to KBR. On the present record, the court is also unable to determine whether, and to what extent, KBR and Service Employees International were integrated into the military chain of command. *Burn Pit Litig.*, 744 F.3d at 351 ("[T]he extent to which [the defendant] was integrated into the military chain of command is unclear.").

On this record, the court cannot conclude as a matter of law that KBR and Service Employees International were, or were not, under military command authority. More is needed.

## IV. Conclusion

The plaintiffs' motion to remand, (Docket Entry No. 15), is denied. KBR's motion to dismiss, (Docket Entry No. 3), is denied. The court authorizes limited discovery on KBR's

Defense Base Act and combatant-activities defenses. Discovery on these defenses will close on August 27, 2021. KBR may file a motion for summary judgment on the Defense Base Act and combatant-activities exceptions no later than September 17, 2021. The court will hear oral argument on the motion on **October 27, 2021, at 10:00 a.m**., by Zoom. A Zoom link will be sent to the parties.

SIGNED on May 4, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge